UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SIERRA CLUB and REGIONAL ASSOCIATION OF
CONCERNED ENVIRONMENTALISTS,

              Plaintiffs,

and                                                                        Case No. 94-cv-4061-JPG

AUDUBON COUNCIL OF ILLINOIS,

              Intervenor,

      v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, TOM VILSACK, Secretary of
Agriculture, UNITED STATES FOREST SERVICE,
TOM TIDWELL, Chief of United States Forest Service,
LOGAN LEE, Acting Regional Forester, ALLEN
NICHOLAS, Shawnee National Forest Supervisor,

              Defendants.

## MEMORANDUM AND ORDER

This matter comes before the Court on the defendants' Notice of Compliance and Motion to Dissolve Injunction pursuant to Federal Rule of Civil Procedure 60(b)(5) (Doc. 81).  Plaintiff Regional Association of Concerned Environmentalists ("RACE")[1] and Intervenor Audubon Council of Illinois ("Audubon Council") (collectively, "the plaintiffs") have jointly responded in opposition to the motion (Doc. 92), and the defendants have replied to that response (Doc. 93). The Court held oral argument on the motion on February 16, 2012.

I.      **History**

This case involves the United States Forest Service's ("Forest Service") plans for managing the Shawnee National Forest ("Forest") over the ten to fifteen years following the

_____

[1]Appendix A to this order sets forth the various acronyms used in this order.

decision to adopt a formal plan.  The Court has previously explained the background of the

Forest and its management planning:

> Congress provided for the creation of national forests through the Creative
> Act of 1891, which gave the President authority to "set apart and reserve . . .
> public lands wholly or in part covered with timber or undergrowth . . . as public
> reservations."  Charles F. Wilkinson & H. Michael Anderson, *Land and Resource
> Planning in the National Forests,* 64 Or. L. Rev. 1, 17-18 (1985) (quoting Act of
> Mar. 3, [1891], ch. 561, 26 Stat. 1095, 1103, *repealed by* 90 Stat. 2792 (1976)).
> The Creative Act did not establish any specific guidelines for forest management.
> Six years later, however, Congress passed the Organic Administration Act of
> 1897 to more clearly specify the purposes of the national forests and provide
> some general guidelines.  Act of June 5, 1897, ch. 2, 30 Stat. 34 (codified as 16
> U.S.C. §§ 473-482, 551 (1988)).  The Act provides, in pertinent part, that "[n]o
> national forest shall be established, except to improve and protect the forest
> within the boundaries, or for the purpose of securing favorable conditions of
> water flows, and to furnish a continuous supply of timber for the use and
> necessity of citizens of the United States . . . ."  16 U.S.C. § 475 (1988).

> Congress subsequently expanded the scope of forest administration in
> 1960 through the [Multiple Use Sustained Yield Act ("MUSYA"), 16 U.S.C.
> §§ 528-31 (1988)], which states that "[i]t is the policy of the Congress that the
> national forests are established and shall be administered for outdoor recreation,
> range, timber, watershed, and wildlife and fish purposes."  16 U.S.C. § 528
> (1988).  These purposes are "declared to be supplemental to, but not in derogation
> of, the purposes for which the national forests were established as set forth in
> section 475 of this title [i.e., the Organic Act]."  *Id.*

> Section 529 of the MUSYA directs the Secretary of Agriculture "to
> develop and administer the renewable surface resources of the national forests for
> multiple use and sustained yield of the several products and services obtained
> therefrom. In the administration of national forests due consideration shall be
> given to the relative values of the various resources in particular areas."  16
> U.S.C. § 529 (1988). Multiple use is defined as:

>> The management of all of the various renewable surface resources
>> of the national forests so that they are utilized in the combination
>> that will best meet the needs of the American people; making the
>> most judicious use of the land for some or all of these resources or
>> related services over areas large enough to provide sufficient
>> latitude for periodic adjustments in use to conform to changing
>> needs and conditions; that some land will be used for less than all
>> of the resources; and harmonious and coordinated management of
>> the various resources, each with the other, without impairment of

the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

16 U.S.C. § 531(a) (1988).

To further facilitate forest management, Congress passed the Resource Planning Act of 1974, which included a provision requiring the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System . . . ." 16 U.S.C. § 1604(a) (1988). This general directive was expanded in the [National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 (1988)], which required the Secretary to promulgate regulations for the development of forest plans that conformed not only to the MUSYA but also to the more detailed procedural and substantive guidelines set forth in the NFMA itself. 16 U.S.C. § 1604 (1988). . . .

(Doc. 43 at 6-8).

The plaintiffs originally filed this action in April 1994 to challenge two records of decision issued in 1992 by the Forest Service regarding the Forest. One of these decisions related to the Forest Service's adoption of an Amended Land and Resource Management Plan ("1992 Forest Plan") for the Forest. The other related to the Forest Service's decision to allow oil and gas leasing within the Forest. The plaintiffs sought judicial review of those decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, which allows the Court to overturn agency actions if they are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2).

The lawsuit raised issues of the Forest Service's compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70d, which requires federal agencies to take a "hard look" at the environmental consequences of their actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). The lawsuit also challenged the Forest Service's compliance

with the NFMA, the MUSYA and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-12.  The Audubon Council was allowed to intervene on the plaintiffs' side a year later.

The plaintiffs' complaint, as construed by the Court, was in nine counts.  Count I challenged the relative values analysis;  Count II argued that the Forest Service was not maintaining the viability of management indicator species ("MIS");  Count III challenged the Forest Service's creation and maintenance of artificial openlands;  Count IV challenged the Forest Service's commercial logging program;  Count V challenged oil and gas leasing in the Forest;  Count VI challenged the creation of all-terrain vehicle ("ATV")/off-highway motorcycle ("OHM") trails;  Count VII challenged the failure to designate the Burke Branch area for wilderness study;  Count VIII challenged the cumulative effects analysis; and Count IX challenged the ecological restoration program.

On September 25, 1995, the Court granted in part and denied in part the parties' motions for summary judgment (Doc. 43).  The Court ruled in favor of the Forest Service on Counts I (relative values analysis), III (artificial openlands), IV (commercial logging program), VII (wilderness study), and IX (ecological restoration).  The Court ruled in favor of the plaintiffs on Counts II (viability of MIS), V (oil and gas leasing), VI (ATV/OHM trails), and VIII (cumulative effects analysis).

A.      Issues on Which Plaintiffs Prevailed

Specifically with respect to Count II, the Court found the Forest Service failed to comply with NEPA and/or various implementing regulations in several respects.  First, the Forest Service did not adequately analyze the cumulative impacts on forest interior species (like neotropical migratory songbirds) that would result from the various uses of the forest authorized by the 1992 Forest Plan such as logging, oil and gas leases and ATV/OHMs.  The Court noted

4

that the cumulative effects analysis in the Final Supplemental Environmental Impact Statement ("1992 FSEIS") did not discuss all of the effects of the various activities allowed under the 1992 Forest Plan or their combined effects.

In addition, the Forest Service did not adequately analyze species viability impacts of the 1992 Forest Plan.  It did not address criticism that it used outdated animal population density data to predict how the 1992 Forest Plan would affect MIS population levels in the future and did not adequately explain how it will satisfy its obligation under the NFMA to monitor MIS population trends.  The Court also found that the Forest Service failed to explain its conclusion that the 1992 Forest Plan would ensure the viability of the Cerulean Warbler, a neotropical migratory songbird with special habitat needs, even though it did not provide habitat large enough to meet minimum nesting requirements.  The Court further found that the Forest Service did not adequately address whether logging outside forest interior management units during migratory bird nesting periods would violate the MBTA by killing neotropical migratory forest interior birds.

With respect to Count V, the Court found that while the Forest Service acknowledged the risk of an oil spill and the efforts to minimize the impact, the Forest Service failed to conduct at least a general analysis of the effects such a spill would have.  As noted above, the Forest Service also failed to discuss the cumulative impact on fish and wildlife that oil and gas leasing, along with other forest uses, would have.

With respect to Count VI, the Court found the Forest Service failed to discuss in the 1992 FSEIS the likelihood of keeping ATV/OHM users on designated trails – especially in light of its and other public lands' problems with such confinement – or the environmental effects if riders cannot be kept on those trails.

5

With respect to Count VIII, the Court reiterated the reasons discussed in connection with Count II that the Forest Service's cumulative effects analysis was inadequate.  It also noted the 1992 FSEIS did not discuss the effects of oil and gas leasing on fish and wildlife and only minimally acknowledged the effects of allowing ATV/OHM use.

Based on these deficiencies, the Court remanded the records of decision for the 1992 Forest Plan and the oil and gas leasing decision, the 1992 FSEIS and the 1992 Forest Plan to the Forest Service.

B.     Injunctive Relief

Subsequently, on March 20, 1996, the Court granted in part and denied in part the plaintiffs' motion for injunctive relief (Doc. 65) and permanently enjoined:  (1) timber cutting for commercial purposes, (2) ATV/OHM use except for state or federal administrative or emergency purposes or by people with disabilities, and (3) surface-disturbing activities like oil and gas leasing activities (Doc. 66).  The Court declined to enjoin (1) openland management, (2) ecological restoration timber cutting, and (3) all other projects to which the plaintiffs did not object and all day-to-day forest management activities.  The injunction allowed the Forest Service to use the vacated 1992 Forest Plan to the extent it was not inconsistent with the Court's rulings.  It further stated, "This injunction shall remain in force and effect until such time as the Forest Service issues new or revised planning documents in a manner consistent with this Court's findings."  Perm. Inj. at 4 (Doc. 66).

II.     **Pending Motions**

On July 26, 2011, the Forest Service filed a notice of compliance with the Court's summary judgment order and injunction (Doc. 81).  It also asks the Court to dissolve the injunction pursuant to Rule 60(b)(5) because it has satisfied the conditions in the terms of the

injunction and because continued prospective application of the injunction is no longer equitable. It argues that by issuing the Final Environmental Impact Statement ("2006 FEIS") supporting the 2006 Land and Resource Management Plan ("2006 Forest Plan"), it has issued "new or revised planning documents in a manner consistent with this Court's findings," Perm. Inj. at 4 (Doc. 66). It believes the 2006 Forest Plan addresses the Court's prior areas of concern:  the viability of migratory bird MIS, the effect of oil and gas leasing, and the effect of ATV/OHM use.  It further argues that continued prospective application of the injunction is no longer equitable.

RACE and the Audubon Council disagree, acknowledging that the Forest Service has issued "new or revised planning documents" but contesting whether they were issued "in a manner consistent with this Court's findings."  Perm. Inj. at 4 (Doc. 66).  They argue that the cumulative impact analysis in the 2006 Forest Plan remains inadequate, still listing possible impacts without really analyzing them in combination.  They also argue the Forest Service still fails to adequately explain how the 2006 Forest Plan ensures the viability of MIS because it does not provide sufficient explanations of the underlying data, methodology and outputs used in its modeling.

Plaintiff Sierra Club takes no position in this matter.

## III.   Standard

Rule 60(b)(5) provides, in pertinent part, that the Court may relieve a party from a final judgment or order where "the judgment has been satisfied, released or discharged . . . or applying it prospectively is no longer equitable."  Under the first provision of Rule 60(b)(5), where the judgment has been completely satisfied, there is no need for it to continue in effect. On the other hand, where a judgment has not been completely satisfied, equity may nonetheless counsel in favor of relief under the final provision of Rule 60(b)(5).  *Horne v. Flores*, 557 U.S.

433, 454 (2009).

The final clause of Rule 60(b)(5) "provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Id.* at 447 (quoting *Rufo* v. *Inmates of Suffolk Cnty. Jail,* 502 U.S. 367, 384 (1992) (considering modification of a consent decree and rejecting the rule of *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932), that Rule 60(b)(5) relief is warranted only if new circumstances will result in a "grievous wrong" unless the decree is changed)). The party seeking relief has the burden of "establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. The party seeking Rule 60(b)(5) relief must also show that the proposed relief is suitably tailored to the change in circumstances. *Id.* at 393.

"[O]nce a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*, 557 U.S. at 447 (quoting *Agostini v. Felton,* 521 U.S. 203, 215 (1997)); *see Sys. Fed'n No. 91 Ry. Employes Dep't v. Wright*, 364 U.S. 642, 647 (1961) ("[A] sound judicial discretion may call for the modification of the terms of an injunction decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen."). The Court should exercise flexibility in its decision and should consider the goals of the original judgment, the factors that are important to the particular litigation – including the public interest where the litigation involves the public's rights – and the nature of the change in circumstances. *See Rufo* at 381, 383; *Horne*, 557 U.S. at 450; *see also Hendrix v. Page*, 986 F.2d 195, 198 (7th Cir. 1993) (*Rufo*'s flexible standard generally applies in all equitable cases). The Court must also keep in mind that if the change in circumstances eliminates the violation of federal law the

injunction was designed to prevent, a continuing injunction "exceed[s] appropriate limits" even if its terms have not been satisfied to the letter.  *Horne*, 557 U.S. at 450.  "If a durable remedy [achieving the objective of the judgment] has been implemented, continued enforcement of the order is not only unnecessary, but improper."  *Id.*;  *see also Rufo*, 502 U.S. at 389 & n.12 (noting that where defendants' actions are no longer deemed unconstitutional, injunction is no longer warranted to remedy an unconstitutionality).

## IV.   Issues

The Court first turns to whether the terms of the injunction have been satisfied under the first clause of Rule 60(b)(5) and then examines whether, regardless of satisfaction of the injunction, it is no longer equitable to enforce it under the last clause of Rule 60(b)(5).  Critical to both of these inquiries are the 2006 Forest Plan and its supporting 2006 FEIS.

### A.   2006 Forest Plan

In the 2006 Forest Plan, the Forest Service selected Alternative 2, one of the four alternatives evaluated in the 2006 FEIS.  Among other things, Alternative 2 manages as forest-interior habitat areas that are at least a mile wide with no power lines, paved roads, levies or lakes.  It allows some even-aged timber harvest, prescribed burning and vegetation management to improve forest-interior habitat by promoting oak-hickory forest-type and reducing non-native pine plantations.  Alternative 2 continues the current restrictions on ATV/OHM use; it prohibits ATV/OHM use except for administrative or emergency use or as authorized by permit or contract.  It also identifies all areas of the Forest except wilderness areas as administratively available for oil or gas leasing.  It further specifies terms and stipulations that must be included in leases, including a prohibition on surface occupancy in certain sensitive areas.  It does not consent to, approve or authorize any specific oil and gas leasing project.

B.      Forest Service's Position

1.      Count II:  Viability of MIS

The Forest Service argues that it has cured the deficiencies in the 1992 Forest Plan noted in Count II.

First, the Forest Service notes that it has conducted a new viability analysis of five new bird MIS, three of which are forest-interior species that have as their habitat mature hardwood forests (worm-eating warbler, scarlet tanager and wood thrush) and two of which are early-successional species (yellow-breasted chat and northern bobwhite).  The analysis considered new field data to identify trends in MIS and to inform use of the Habitat Suitability Index model ("HSI") to predict future trends.  In this model, scores were assigned to areas based on the presence of favorable and unfavorable characteristics for MIS habitat.  The score was then multiplied by the number of acres of the area to come up with a Habitat Capability ("HC").  The HCs were predicted for different habitats under the various plan alternatives based on how the alternatives' activities would impact the habitat, and those predictions were compared with data and verified by experts.  The Forest Service's viability analysis led to the conclusion that the 2006 Forest Plan – Alternative 2 of the 2006 FEIS – would result in a higher HC for the three forest-interior MIS and a stable or slightly increasing population trend for the MIS.  The Forest Service interpreted this to indicate viable populations under the 2006 Forest Plan.

The Forest Service contends that it has cured deficiencies with its species monitoring requirements.  Specifically, it notes that the 2006 Forest Plan's requirements were promulgated under a different version of the rule requiring monitoring.  The rule in place in 1995 required monitoring of MIS population trends and determining relationships to habitat changes, 36 C.F.R. § 219.19(a)(6) (1992), but at the time of the 2006 Forest Plan, that rule had been superseded by

10

later rules that had different requirements.

The Forest Service points to the 2006 Forest Plan's forest-interior management guidelines developed after examining data and research and after consulting with bird experts. Those guidelines provide that forest-interior habitat should include areas of greater than 500 contiguous, forested acres. All areas that are at least one mile in diameter without powerlines, paved roads, levees or lakes should be considered for forest-interior habitat management. Each of those areas would contain a 100-acre forested core, the minimum area necessary for nesting habitat, and a 400-meter buffer from "hard edges" such as powerlines, roads, levees or lakes, the minimal edge buffer that allows successful reproduction of forest-interior species in the forested core. Using these criteria for interior-forest habitat, thirty-six forest-interior habitat areas exist in the Forest, sixteen of which exceed 1,000 acres and three of which exceed 2,000 acres.[2]  Some areas of forest-interior habitat will be managed for large blocks of oak-hickory forest using vegetation management such as prescribed burns, timber harvest and timber stand improvement; all areas will be subject to prescribed burns. These vegetation management practices will promote restoration of oak-hickory forest and provide a diverse mix of mature and early-successional growth forest that is favorable to some MIS.

The Forest Service also argues that in the 2006 FEIS it appropriately considered the

---

[2]The plaintiffs complain that there is no chart in the 2006 FEIS to help the public identify these areas. However, the 2006 Forest Plan indicates that the forest-interior habitat guidelines (FW26.7) should be provided in contiguous, forested areas of greater than 500 acres in CR, CV, EH, MH, NA, NM and WD management area prescriptions, and that the Forest Service will actively manage for forest-interior habitat in EH and MH management area prescriptions. 2006 Forest Plan at 43. It is possible that, with some effort, the public could consult the 2006 Forest Plan map showing the management area prescriptions throughout the Forest to determine which are large enough to qualify for forest-interior management. Nevertheless, the Court recommends the Forest Service make this task easier by providing the listing the plaintiffs request.

cumulative effects, including the combined incremental effects, on forest-interior habitat and migratory birds.  It points to sections of the 2006 FEIS in which it analyzes the anticipated effects of possible activities – such as ATV/OHM use, timber harvest, vegetation management, prescribed burns and oil and gas exploration and development – on resource areas such as biodiversity of habitats, biodiversity of species, and forest-interior habitat.  No longer a laundry list of activities and discreet effects, this analysis, the Forest Service argues, remedies the 1992 FSEIS's shortcomings noted in the Court's 1995 order.

The Forest Service also points to its consideration of the 2006 Forest Plan in relation to the MBTA, noting that some courts have held recently that the MBTA was intended to apply to hunting and poaching, not forest land management decisions.  Nevertheless, the Forest Service has consulted with the U.S. Fish and Wildlife Service and other agencies and experts to develop the interior forest management guidelines discussed above and restrictions on planned activities like prescribed burns or timber harvests to minimize the impact on migratory birds.  It notes that the 2006 Forest Plan expands migratory bird interior habitat, reduces forest fragmentation and improves vegetation diversity, all beneficial to migratory birds.  The Forest Service believes this satisfies the Court's concerns in its 1995 order.

As for the viability of the Cerulean Warbler, the Forest Service argues that it reexamined the species' habitat needs and found that those needs vary by region.  The species nests in the canopies of mature or old-growth hardwood trees found in forest interior but have also been found in areas where the canopy has opened up.  Prior research showed that 700 hectares (1,729 acres) was the minimal breeding habitat, and under the 2006 Forest Plan, all of the six tracts in the Forest of over 1,700 acres are managed as forest interior, including 2,000-acre Cave Valley, the best Cerulean Warbler habitat on the Forest.  In addition, timber harvest will not be allowed

in known Cerulean Warbler habitat, although it would be allowed in potential habitat with the goal of creating better, oak-dominated Cerulean Warbler habitat in the long-term.  Thus, the Forest Service argues, the 2006 FEIS addresses and cures the Court's concerns about adequate Cerulean Warbler habitat.

The Forest Service argues the level of specificity contained in the 2006 FEIS and ROD is appropriate for those documents and the details the plaintiffs seek are contained in the complete administrative record, which is not before this Court.

2.      <u>Count V:  Oil and Gas Leasing</u>

The Forest Service argues it has cured the deficiencies in its analysis supporting oil and gas leasing by removing oil and gas leasing as an activity authorized by the 2006 Forest Plan.  It notes that the 2006 Forest Plan simply identifies lands that are administratively available for leasing and defines minimal lease terms and stipulations (*e.g.*, seasonal limitations, spacing, surface occupancy prohibitions) to protect the environment but does not consent to any actual leasing as the 1992 Forest Plan did.  Actual leasing would be subject to further environmental review pursuant to NEPA at the project level at the time of the leasing.  Additionally, the 2006 Forest Plan discusses at the programmatic level the effects of potential spills of oil or brine.

3.      <u>Count VI:  ATV/OHM Use</u>

The Forest Service argues it has adopted the prohibitions of the Court's injunction, so it no longer needs to analyze impacts of ATV/OHM corridors.

4.      <u>Count VIII:  Cumulative Effects</u>

The Forest Service believes its consideration of cumulative effects goes beyond a mere laundry list of effects from individual actions and examines the combined effects of various activities on various areas of the environment.  As an example, it points to its discussion of the

effects of various activities on MIS and on the Cerulean Warbler, including the predicted change

in the respective HCs and population trends that would result from implementation of each

alternative.  It also notes the 2006 FEIS's discussions of cumulative impacts on the various

physical and biological characteristics of the Forest.

        C.     <u>Plaintiffs' Position</u>

             1.     <u>Count II:  MIS Viability</u>

RACE and the Audubon Council argue that since the Court's injunction the Forest

Service has essentially been implementing the equivalent of Alternative 3 (the alternative with

the least amount of active forest management) in the 2006 FEIS, which has resulted in increasing

or stable MIS populations, and that the 2006 Forest Plan provides smaller areas (500-acre areas)

and less protection (timber harvest is allowed) for MIS.  RACE and the Audubon Council also

argue that the Forest Service did not disclose the underlying data, methodology or outputs of the

HSI model it used to predict cumulative effects on forest-interior species, the basis for its

conclusion that the 2006 Forest Plan ensured MIS viability.  They complain that the HSI scores

are provided in terms of a forest-wide mean score so that different forest areas cannot be

compared with each other.  They also argue that the HSI scores only incorporate some of the

activities included in the 2006 Forest Plan and that the cumulative effects of the remaining

activities (recreational use of trails and roads, dispersed recreation, developed recreational site

use, aquatic resource management, minerals management and land-ownership adjustment) are

not discussed.  One of the major omissions, the plaintiffs note, is the absence of any discussion

of the effects of ATV/OHM use on MIS or forest-interior habitat.

Additionally, they question the 2006 FEIS's math.  They suggest it is impossible that the

existing 184,700 mature hardwood forest acres on the Forest would increase to 200,900 acres of

forest-interior MIS habitat after more than 8,000 acres of timber harvest over the next decade and 25,000 acres of timber management over the next fifteen years.  They note other apparent inconsistencies, including the plan to maintain a total number of acres in various forest types that exceeds the total acreage of the Forest itself (about 284,600 acres).

As for the viability of the Cerulean Warbler, RACE and the Audubon Council maintain that the Forest Service's "thorough" analysis was anything but thorough.  It consists of a list of activities effecting forest-interior habitat, a brief, general discussion of the effects on that habitat, and an unsubstantiated summary of the effect on the Cerulean Warbler population.  It further notes that following a decline prior to the 1992 FSEIS, the Cerulean Warbler's population has increased under the restrictions imposed by the Court's injunction.

With respect to the viability of forest-interior bird species, RACE and the Audubon Council argue that the 2006 Forest Plan monitoring provisions remain too vague to tell whether they satisfy the monitoring requirements of 36 C.F.R. § 219.19(a)(6) (1982) and that neither the ROD, the 2006 FEIS nor the 2006 FEIS Appendices include any of the specific population data (or summaries of it) on which the viability analysis was based.  The plaintiffs also question whether there is an adequate explanation of how smaller forest-interior areas that allow logging would ensure the viability of forest-interior bird species.

RACE and the Audubon Council also point to a complete lack of explanation of how logging in forest-interior areas outside the core forest-interior areas during the nesting season for migratory birds can comply with the MBTA.

### 2.    Count V:  Oil and Gas Leasing

RACE and the Audubon Council argue that the Forest Service has only stated that oil and gas leasing has occurred in the past and has not considered the cumulative effects of such

leasing.

### 3.    Count VI:  ATV/OHM Use

RACE and the Audubon Council concur that the Court should vacate the portion of the injunction prohibiting ATV/OHM use in light of the 2006 Forest Plan's adoption of its standard, although they dispute that the plan is equivalent to the injunction in force and would not support a future change in direction to allow ATV/OHM use on the Forest.

### 4.    Count VIII:  Cumulative Effects

In addition to their arguments about the cumulative effects on MIS, RACE and the Audubon Council note that the discussion of the cumulative effects lumps together two alternatives that allow vastly different amounts of ATV/OHM use and would therefore have vastly different cumulative effects.

RACE and the Audubon Council argue the 2006 FEIS still does not analyze cumulative effects to the extent required by regulation, 40 C.F.R. §§ 1508.7 & 1508.25.  RACE and the Audubon Council point specifically to the 2006 FEIS's discussion of cumulative effects on MIS.

## V.    Analysis and Decision

### A.    Satisfaction of the Injunction

It is important to remember that in the Court's review of the pending motion it asks whether the Forest Service has satisfied the terms of the injunction by curing the deficiencies found in the Court's 1995 order.  It will not conduct a full-scale review of the 2006 Forest Plan's compliance with NEPA, NFMA or any other relevant statute or regulation.  Such review must occur, if at all, under the APA after exhaustion of administrative remedies regarding the 2006 Forest Plan and after consideration of the full administrative record, which is not before this Court.

1.    Count II:  MIS Viability

a.    Stale Data

With respect to the use of stale data in analyzing species viability impacts despite concerns of experts in the field, the 2006 FEIS cures that shortcoming.  First, it is important to note that the flaw found in the 1992 FSEIS was in the freshness of the population density data fed into the Habitat Evaluation Program ("HEP"), a precursor to the HSI that relied on population density rather than habitat quality measures.  The Court noted that the author of the study from which the data was taken and another expert opined that using the ten-year-old population density data to predict future MIS populations was not scientifically supportable.  The Court found that the Forest Service had adequately defended its use of the HEP program but that it had not addressed the stale data issue in its analysis.

In 2006, the Forest Service gathered more recent research and data – from the early 2000s – to inform the HSI and verify its ability to predict population trends.  *See* 2006 FEIS at 145-46.  Thus, the Forest Service's population density data was not stale.

Furthermore, the issue with the 1992 FSEIS was the quality of outdated *population density* data fed into the HEP model, but the HSI model used in the 2006 FEIS does not rely on population density data.  Instead, it relies on calculation of *habitat quality*.  *See* 2006 FEIS at 144.  No party has hinted that the habitat quality data fed into the HSI model was stale or inappropriate for use in the model.  In light of the fact that the Forest Service did not feed population density data into the HSI model, outdated population density data is no longer a relevant issue.

b.    Monitoring Requirement

As for the Forest Service's explanation of how it will satisfy its obligation under the

17

NFMA to monitor population trends of MIS, the Court noted in 1995 that the 1992 Forest Plan did not explain what kinds of monitoring would be conducted and that monitoring without field surveys would provide no monitoring at all where the Forest Service used a model dependent on accurate population density input.

The Forest Service's first contention – that the NFMA's monitoring requirement no longer applies because the 1982 planning rule has been replaced – has no merit.  The Forest Service admits in the ROD that the 2006 Forest Plan was developed in accordance with the 1982 planning regulations, ROD at 3,which it was permitted to do by the 2005 planning regulations, ROD at 3 n.1 (citing 36 C.F.R. § 219.14(e) (2005) (plan development initiated before the 2000 rule changes may continue to use 1982 rules)).  Furthermore, the 2006 FEIS itself cited the 1982 version of the rules governing the plan development.  *See, e.g.,* 2006 FEIS at 4.  Thus, the same 1982 planning regulations applied equally to the 1992 Forest Plan and the 2006 Forest Plan.

Nevertheless, the 2006 Forest Plan's explanation of how the Forest Service will satisfy its monitoring obligation cures the defects noted in the Court's 1995 order.  While the plaintiffs are correct that the Forest Service does not expressly address this deficiency of the 1992 Forest Plan in its original brief, it is implicit in its discussion of the HSI.  The HSI is used to predict species viability by using changes in available habitat quality and quantity as a proxy for trends in species populations, which the Seventh Circuit Court of Appeals has noted is a reasonable method of monitoring species population trends.  *See Ind. Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 863-64 (7th Cir. 2003) (citing with approval *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 762–63 (9th Cir. 1996)).  Unlike the HEP model used in the 1992 Forest Plan, the HSI does not depend on population density input, so it can still produce meaningful predictions absent annual field surveys.  The reliance on the HEP model

without any new population density data was what the Court found inadequate in the 1992 Forest

Plan, but that deficiency no longer exists.

Additionally, the 2006 Forest Plan contains a plan to measure population trends using the

HSI model *and* other monitoring methods.   *See* ROD at 41 ("Population trends may be

determined by a variety of methods, including, but not limited to, data and analysis relating to

habitat.").  It acknowledges the regulatory requirement for the Forest Service to monitor MIS

population trends annually in cooperation with fish and wildlife agencies to the extent

practicable.  *See* 2006 Forest Plan at 97.  It has also included in a monitoring matrix a plan to

monitor MIS population trends and nesting-success trends by assessing annually "[a]cres of

suitable habitat, populations and some nesting-success measurements" to determine the effect of

management activities.  *Id.* at 101.  Additionally, it has a plan to assess biological diversity and

MIS habitat by considering annually "[r]eports from Forest Service, researchers, cooperating

agencies and others regarding habitat condition and suitability."  *Id.* at 103.  The specific

monitoring program will be included in an annual plan, *id.* at 95, which will prioritize

monitoring various aspects of the 2006 Forest Plan by assessing a number of factors including

whether a regulation mandates certain monitoring activities, *id.* at 98.  The monitoring will result

in an annual report of, among other things, a "[s]ummary of available information on MIS and/or

other species of concern."  *Id.* at 99.  *See also* ROD at 12 (MIS "are already associated with

credible monitoring protocol and, by tracking changes in either the habitats created for these

species or estimating specific population changes, we will be able to better understand the effects

of implementing projects under this Plan and make appropriate changes where needed.").  In

light of these planned monitoring efforts and required annual reports, the deficiencies noted in

the Court's 1995 order have been sufficiently cured.  Nevertheless, to alleviate the plaintiffs'

concerns that MIS will be inadequately monitored even with the foregoing provisions, the Court recommends that, to the extent possible, the Forest Service clarify during the administrative review process further details regarding the MIS monitoring that will be implemented in the 2006 Forest Plan.

c.    <u>Cerulean Warbler</u>[3]

In 1995, the Court found that the Forest Service gave inconsistent explanation about whether its provision of 18 forest interior tracts (called forest-interior management units or "FIMUs") of 1,100 acres each would provide the minimum amount of breeding habitat suggested in a 1989 study – 1,729 unbroken forest-interior acres.  Instead, the Forest Service applied its own mathematical formula (using the outdated population data discussed above) to determine that the 1992 Forest Plan would provide sufficient breeding habitat for the Cerulean Warbler.

In the 2006 Forest Plan, six of the tracts designated for forest-interior management contain more than 1,700 acres, including the 2,000-acre Cave Valley, *see* 2006 FEIS at 21, known Cerulean Warbler habitat, *id.* at 198.  These areas would be managed with the goal of increasing the quality and quantity of habitat of the Cerulean Warbler over the long term, although management practices like timber harvest could have negative short-term effects on the Cerulean Warbler habitat by reducing potential nesting sites and increasing canopy openings and potential cowbird parasitism.  *See* RFSS Biological Evaluation at 41-42; 2006 FEIS at 204. Timber harvest would not occur, however, in known Cerulean Warbler habitat like Cave Valley,

---

[3]The Cerulean Warbler was identified as an MIS in the 1992 Forest Plan, but in the 2006 Forest Plan it was identified as a species with viability risk and a Regional Forester Sensitive Species, but not an MIS.

and oil and gas leases in Cave Valley would have a "no surface occupancy" restriction.  *See* 2006 FEIS at 204; 2006 Forest Plan at 55, 56.  Additionally, in Cave Valley no surface disturbing activities would be allowed during nesting season.  *See* 2006 Forest Plan at 55. This resolves the Court's concerns that the Forest Service has not provided sufficient forest-interior habitat to maintain viable Cerulean Warbler populations.  The 2006 Forest Plan provides six 1,700-acre tracts available for Cerulean Warbler nesting habitat.

d.   <u>MBTA</u>

With respect to the MBTA, the Court found in 1995 that the Forest Service failed to meaningfully respond to the plaintiffs' concerns that logging outside FIMUs during migratory bird nesting periods would violate the MBTA by "taking" or "killing" young migratory birds protected by treaty.  In the 2006 FEIS, the Forest Service noted that a plan forbidding timber harvest during migratory bird nesting season would have the same effect on migratory birds as prohibiting timber harvest altogether, one of the provisions of Alternative 3.  *See* 2006 FEIS at 18.  This, however, does not constitute examining whether the selected alternative, Alternative 2, complies with the MBTA by refraining from "taking" or "killing" certain migratory birds without a permit from the Department of the Interior.  *See* 16 U.S.C. §§ 703-12.

However, the Forest Service and the Regional Forester considered the issue of compliance with the MBTA elsewhere.  They concluded that the cooperation with the U.S. Fish and Wildlife Service, the Department of the Interior agency charged with enforcing the MBTA, in developing the 2006 Forest Plan and the lack of any indication from that agency that the 2006 Forest Plan violates the MBTA, meant that the plan satisfied the MBTA.  *See* ROD at 45, 47; 2006 FEIS App'x I at 251 (responding to criticism that the 2006 Forest Plan did not comply with the MBTA).

21

The Regional Forester further recognized that several courts have held the MBTA does not apply to forest plans.  It is true that courts have come to this conclusion under several theories.  *See, e.g., Sierra Club v. Martin*, 110 F.3d 1551, 1555-56 (11th Cir. 1997) ("The MBTA does not apply to the federal government.");  *Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 115 (8th Cir. 1997) ("[W]e agree with the Forest Service that MBTA does not appear to apply to the actions of federal government agencies.");  *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 549 (W.D. Pa. 1997) (loss of migratory birds from timber harvest does not violate MBTA);  *Mahler v. U.S. Forest Serv.*, 927 F. Supp. 1559, 1573-74 (S.D. Ind. 1996) (logging during migratory bird nesting season is not a "taking" because it does not involve hunting or poaching);  *but see Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882, 888 (D.C. Cir. 2000) (finding federal agency violated the MBTA by planning to kill geese without a permit).  The Regional Forester decided that such rulings supported his conclusion that the MBTA does not preclude forest planning activities such as timber harvesting during the nesting season as long as those activities comply with the MUSYA, the NFMA and Executive Order 13186.  ROD at 47;  *see also* 2006 FEIS App'x I at 251 (stating that courts have found MBTA does not apply to programmatic land management plans developed by federal agencies).

Whether the Regional Forester is ultimately right or wrong that the MBTA does not apply to the Forest Service for forest planning activities, he has given consideration to the question of the relationship between the 2006 Forest Plan and the MBTA and has come to a reasonable conclusion based on cooperation with the U.S. Fish and Wildlife Service.  This is what was lacking in connection with the 1992 Forest Plan.

e.    Direct and Indirect Effects

In its 1995 order, the Court found that the 1992 FSEIS contained an inadequate

22

discussion of the effects of the 1992 Forest Plan because it failed to include the effects of all of the various activities allowed under the 1992 Forest Plan and cited, as examples, "a brief passing reference to the minor effects of ATV use and . . . no discussion whatsoever of the impact of oil and gas leasing or other mineral development."  Mem. & Order at 21 (citing 1992 FSEIS at 4-109 to 4-118).

The 2006 FEIS has cured the deficiencies in the discussion of direct and indirect effects on MIS by analyzing the impact of all thirteen management activities allowed by the 2006 Forest Plan.  Seven of the thirteen possible activities have been built into the HSI model (restrictive management, roads and trails management, timber-harvest methods, vegetation treatments, fire management, integrated pest management and openings/openland management).  *See* 2006 FEIS at 147.  Additionally, the 2006 FEIS's discussion of the HC results for each alternative – which incorporates the seven aforementioned activities – discusses some of the specific activities built into the HSI such as, for example, timber harvest and prescribed burns.  *See id.* at 147-53.

The 2006 FEIS also considers separately the remaining six activities (recreational use of roads and trails, dispersed recreation, developed recreation site use, aquatic resource management, minerals management and land-ownership adjustment).  The effects of ATV use, both authorized and unauthorized, are addressed, *see id.* at 154, *see also id.* at 273 (acknowledging a high incidence of unauthorized ATV/OHM use in many areas), as are the general effects oil and gas drilling and production facilities would have on the Forest areas that are home to MIS and other migratory birds, *see id.* at 155;  *see also id.* at 119 (acknowledging surface occupancy of mineral operations could cause displacement of trees);  *id.* at 240-41 (discussing effects of oil and gas drilling and leasing on forest-interior habitat).  The Court is no longer concerned that the Forest Service has not analyzed the direct and indirect effects on MIS

adequately.

f.      Cumulative Effects

The Court further found in 1995 that the 1992 FSEIS failed to adequately analyze the cumulative effects or cumulative impact of various activities on MIS and their forest-interior habitat.  Cumulative effects are defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  The Court found that the Forest Service did not analyze the effects of the various activities in combination but instead provided a "laundry list" of separate adverse effects that simply restated the direct and indirect effects discussed earlier.

The Court agrees with RACE and the Audubon Council that in certain places, the 2006 FEIS lists nothing more than activities the effects of which should be considered cumulatively because they have an effect on the particular physical or biological characteristic of the Forest.  *See, e.g., id* at 46-47, 157  However, elsewhere the 2006 FEIS has adequately set forth the required analysis in the context of the discussions of the direct and indirect effects of each activity.  For example, the 2006 FEIS identifies habitat loss and fragmentation as a danger to the viability of mature-forest MIS.  *Id.* at 158.  It further notes that components of the 2006 Forest Plan pull in different directions on this issue:  land acquisition and consolidation can work to reduce fragmentation, but mineral exploration (such as oil and gas leasing) and timber harvest can cause increased fragmentation in some localized areas.  *Id.* at 146-53, 157-60.  On the other hand, timber harvest and other vegetation management in mature-forest MIS habitat can benefit some species that depend on early-successional forest and can help restore oak-hickory forests

(preferable habitat for some MIS) that are threatened by maple-beech growth. *Id.* at 144. In its discussion of cumulative effects on MIS, the 2006 FEIS recognizes the 2006 Forest Plan's land consolidation and forest-interior management features (including timber harvest) will result in better habitat – a "source" – for mature-forest MIS and concludes that its cumulative effect would be minimally beneficial to MIS in light of activity on private land surrounding the Forest. *Id.* at 159. The 2006 FEIS then synthesizes the various factors to arrive at a forest-wide quantitative estimate of the total impact on MIS habitats and population trends. *See* 2006 FEIS at 139, 146, 156 & 161. The 2006 FEIS contains similar discussions and forest-wide quantitative estimates with respect to forest-interior habitat under each alternative. *See* 2006 FEIS at 235-43. This type of synthesis and conclusion is what the 1992 FSEIS's cumulative effects analysis was missing.

The Court is satisfied that the Forest Service has adequately cured the 1992 FSEIS's deficiencies in its explanation of the cumulative effects on MIS, even if it has not done so with the precision, organization or clarity RACE and the Audubon Council desire. The Forest Service will, of course, have to conduct another cumulative effects analysis when a specific project is proposed, at which time more concrete cumulative effects predictions will be possible because the location, magnitude and duration of the project will be known.

In sum, the Forest Service has adequately addressed the Court's concerns with respect to various aspects of the analysis of MIS viability.

2.   Count V:  Oil and Gas Leasing

The 1992 FSEIS's flaw with respect to consenting to oil and gas leasing was that it failed to discuss the effects of an oil spill and to include oil and gas leasing in its discussion of cumulative effects on fish and wildlife.

As a preliminary matter, the 2006 Forest Plan does not consent to oil and gas leasing like the 1992 Forest Plan did.  It simply identifies areas that are administratively available for leasing, which would occur only after later project-specific environmental analysis, and provides the stipulations that certain leases must contain (*e.g.*, no surface occupancy in special areas). *See* 2006 Forest Plan App'x G at 127-28.  Thus, the level of specificity with which the 2006 FEIS must discuss the impacts of oil and gas leasing is less than it would be had the 2006 Forest Plan actually consented to leasing.  Detailed examination can be left for environmental analysis of site-specific projects where the exact location is known and the impact on the surrounding habitat and features will be more predictable.  *See* 40 C.F.R. § 1502.20; 40 C.F.R. § 1508.28 (providing for tiering, *i.e.*, "the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses. . . .").

> a.  Oil Spills

As for the specific flaws found in the Court's 1995 order, the Forest Service remedied the lack of analysis about the effects of an oil spill.  While it still sets forth efforts that will be made to minimize the likelihood and impact of a spill, it also discusses how the environment would be impacted by a spill.  Most of these consequences are on soil and water.  *See* 1992 FSEIS at 78-80.  The 2006 FEIS noted that the effect of spills of oil or brine vary depending on the properties of the spilled substance, the sensitivity of the affected habitats, the volume of the spill and its proximity to Forest features such as streams.  Such effects include reduced soil productivity from saline brine; adhesion to rocks or other surfaces, sinking in water bodies, and penetration into soil by oil; and negative impacts on organisms that feed on stream sediments and on habitats of fish and macroinvertebrates.  The effects are usually temporary because remediation can return the area to pre-spill condition.  This analysis remedies the deficiency the Court found in the 1992

26

FSEIS regarding analysis of the effects of a spill.

b.    Cumulative Effects

As for including the effects of oil and gas in discussion of the cumulative effects on fish and wildlife, the 2006 FEIS has remedied that shortcoming.

As a preliminary matter, the Court notes that the 2006 FEIS does not contain a section addressing the cumulative effects on "fish and wildlife," as the 1992 FSEIS did.  *See* 1992 FSEIS at 4-106 to 4-118.  The 1992 FSEIS's "fish and wildlife" section actually addressed the cumulative effects of the seventeen MIS selected in that analysis.  The 2006 FEIS contains a separate section specifically addressing the cumulative effects on its five MIS, *see* 2006 FEIS at 157-61.  However, the 2006 FEIS also contains a section discussing the effects on the "wildlife and fish" that have been selected as Regional Forester Sensitive Species.  *See* 2006 FEIS at 202-231.  This lack of parallelism in the organization the 1992 FSEIS and the 2006 FEIS makes it difficult to determine whether the deficient discussion in the 1992 FSEIS has been fixed in the multiple discussions in the 2006 FEIS.  The Court believes it has been.

The 2006 FEIS contains discussions of the direct, indirect and cumulative effects of minerals management on the 2006 FEIS MIS and their habitat.  *See* 2006 FEIS at 155-61 (effects on MIS) & 240-43 (effects on forest-interior habitat).  These effects are primarily localized forest fragmentation from openings in the canopy for drilling and production facilities with minimal adverse effects on the respective Forest features.  As noted above, these effects were adequately incorporated into the MIS cumulative effects discussion.  Additionally, there will be no fragmentation without authorization for a specific oil and gas lease, and in the 2006 Forest Plan there is no such site-specific authorization.  The effects of such a project at each site will be different depending on the size of the canopy opening required, the habitat immediately

27

surrounding the oil and gas operation, other oil and gas or timber harvest activities occurring on

the Forest, and other details that can only be determined when a specific project is proposed.

The Court believes that in light of the uncertainty of what oil and gas leasing might actually

occur, if any, the general discussions in the 2006 FEIS are sufficient to resolve the Court's

concerns in its 1995 order.

3.      Count VI:  ATV/OHM Use

The 2006 FEIS notes the effects of allowing ATV/OHM use on the Forest and has come

to the conclusion that the best alternative is the same as the Court's injunction:  to prohibit it

with certain limited exceptions.  Thus, the Forest Service has essentially adopted the Court's

injunction as its own rule.  The Forest Service has remedied its inadequate environmental

analysis by removing from its plan the activity that the analysis was tendered to support.

4.      Count VIII:  Cumulative Effects

As noted above, the Forest Service has resolved the Court's concerns about the

cumulative effects analysis with respect to MIS and oil and gas leasing, and it has removed

ATV/OHM use from its management plan.  Thus, the injunction with respect to Count VIII has

been achieved.

5.      Additional Arguments

RACE and the Audubon Council assert several additional alleged deficiencies in the

2006 Forest Plan that did not serve as the basis for the Court's injunction.  For example, they

complain that there is no chart specifying where forest-interior management standards and

guidelines will be implemented, *see supra* note 2;  they question whether the forest-interior

management guidelines are adequate to ensure species viability for other reasons than those the

Court relied on in its 1995 order; they challenge the Forest Service's failure to explain how it can

28

allow logging in forest-interior management areas during nesting season while at the same time prohibiting other activities like prescribed burns, mowing and oil and gas surface occupancy that appear to potentially be less harmful to birds; and they question the validity of the HSI model. These are good questions, but because deficiencies in those areas were not the basis for the injunction, the Court need not consider them here. The plaintiffs may raise those issues in a separate challenge to the 2006 Forest Plan.

Additionally, the Court does not intend this order to serve as *res judicata* for similar issues that may be raised in a separate challenge. The question before the Court here was whether the Forest Service had remedied specific defects in the 1992 Forest Plan noted by the Court in 1995, not whether it complied with all statutory requirements in promulgating the 2006 Forest Plan. That decision may be made by another court, another day, with reference to a comprehensive administrative record.

B.      Continued Enforcement of Injunction in Light of Changed Circumstances

Even if the Forest Service had not satisfied the Court's injunction, the Court would find it no longer equitable to enforce the injunction.

The Forest Service points to the 2006 Forest Plan, supported by the 2006 FEIS, as a change in the factual conditions relative to the enjoined activity. It also argues that continuation of the injunction is not in the public interest. The Court's 1995 order, it notes, reaches beyond the parties and impacts the public's right to sound, efficient management of public lands by knowledgeable government officials. It further argues that the purpose of the injunction – protecting the environment until a new, adequate environmental impact statement and Forest plan could be completed – has been achieved, and the injunction is no longer necessary. They argue that any flaws with the 2006 Forest Plan should be remedied through an administrative

29

appeal of that plan.

The plaintiffs disagree, arguing that the public interest is served by ensuring the Forest Service complies with NEPA and other planning rules before making decisions about and taking action to manage the Forest.  It has not done this in the 2006 Forest Plan, they maintain, so the injunction should continue.

Circumstances have significantly changed since the Court's 1995 order and the 1996 injunction based on that order.  The Forest Service has not simply supplemented the 1992 Forest Plan or the 1992 FSEIS to bring those documents into compliance with the Court's order.  On the contrary, it has embarked on an entirely new forest planning process that was based on entirely new environmental analysis and resulted in the selection of a different forest planning alternative.[4]  This is a significant change in factual circumstances.

That new plan – the 2006 Forest Plan – is subject to a new administrative appeal process and, if necessary, a new judicial review under the APA.  That appeal and judicial review provides a far better avenue for a comprehensive determination of compliance with NEPA, NFMA, and any other relevant statute or regulation.  Reviewing the 2006 Forest Plan through the lens of the flaws in the 1992 FSEIS is like trying to fit square pegs in round holes.  For example, in 1995 the Court found flaws with population density data fed into the HEP, but the 2006 FEIS did not use the HEP model.  Instead, it used the HSI, which uses habitat quality data rather than population density data, although it appears to use population data to validate the model.  At a minimum, the relevance of population data to the 2006 Forest Plan is unclear and is

---

[4]The 2006 FEIS's Alternative 1 reflected the plans set forth in the 1992 Forest Plan.  The ROD passed over Alternative 1 in favor of Alternative 2, which became the 2006 Forest Plan.

different from its relevance to the 1992 Forest Plan.

Additionally, in this Rule 60(b)(5) proceeding, the Forest Service has not had the opportunity to address the plaintiffs' criticisms of the 2006 Forest Plan through an administrative appeal and to build a complete administrative record to bring before the Court on judicial review.  Indeed, review of a forest plan under the APA is ordinarily only available if the party seeking review has exhausted available administrative appeals.  *See Shawnee Trail Conservancy v. U.S. Dep't of Agric.*, 222 F.3d 383, 389 (7th Cir. 2000);  *Glisson v. U.S. Forest Serv.*, 55 F.3d 1325, 1328 (7th Cir. 1995).  That is because APA provides for review only of final decisions, 5 U.S.C. § 704, and Forest Service regulations provide that a decision is final and appealable only after administrative appeals are exhausted, 36 C.F.R. § 215.21.  The administrative appeal requirement preserves a respect for the separation of powers between branches of the federal government:

> The purpose of the exhaustion doctrine is to allow the administrative agency in question to exercise its expertise over the subject matter and to permit the agency an opportunity to correct any mistakes that may have occurred during the proceeding, thus avoiding unnecessary or premature judicial intervention into the administrative process.

*United Farm Workers v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1253 (9th Cir. 1982), *quoted in Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).  The Court believes it is not appropriate to make a judgment about the legality of the 2006 Forest Plan – a completely different plan than the 1992 Forest Plan – through the back door by labeling it as review of an injunction.  Notwithstanding *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988), discussed below, the Court believes that in the present circumstances the best route to comprehensive judicial review is through the front door after exhaustion of administrative remedies.  Because the 2006 Forest Plan and its supporting documents superseded the documents

31

on which the Court's injunction was based, it should be reviewed through a separate appeal and considering a full administrative record.

The plaintiffs argue that, as in *Penfold*, the Court should consider follow-up analysis without requiring an additional administrative appeal.  The case at bar, however, is distinguishable from *Penfold*, which involved Bureau of Land Management ("BLM") decisions to approve mining operations.  There, the district court found that the BLM had violated NEPA by failing to adequately address in its environmental assessments ("EA," a less rigorous environmental review than a full-fledged environmental impact statement) the cumulative impacts of large mining operations in four specific watersheds.  *Id.* at 1319-20.  The court then ordered the BLM to prepare an adequate cumulative impacts analysis for each watershed and enjoined approval of further plans after the upcoming mining season until an adequate analysis was completed.  *Id.* at 1320.  In light of the large number of innocent parties involved (private miners dependent on the mining approval process), the need to resolve the dispute as quickly as possible (in time for the following mining season), and the BLM's poor record of compliance with NEPA, the court further ordered that it would retain jurisdiction to review the adequacy of the ordered analysis.  *Id.*; *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1311 (D. Alaska 1987). The BLM appealed, arguing that court exceeded its authority in retaining jurisdiction over the new analyses without first requiring exhaustion of administrative appeals.  *Penfold*, 857 F.2d at 1321-22.  The Court of Appeals examined the purpose of the administrative appeal process along with factors such as:

> the adequacy of the administrative remedy, whether the issue presents a factual or legal question, the need for an administrative record, the efficiency of an administrative versus a judicial proceeding, and whether the administrative process would obviate unnecessary judicial proceedings.

*Id.* at 1322.  The Court of Appeals held that, in the particular circumstances, the district court did not abuse its discretion in retaining jurisdiction to review the new analyses without requiring a new administrative appeal.  *Id.*

This case differs from *Penfold* in a number of ways, most of them dealing with the factual circumstances surrounding the respective injunctions.  The agency decision at issue in this case – adoption of an entire forest plan proposing myriad activities and designed to guide forest management for more than a decade – is far more massive and complex than the mine approval decisions at issue in *Penfold*.  There is also less urgency than there was in *Penfold* because forest plans are long-term plans with few, if any, innocent parties (or species) relying on them for their livelihood from year to year, and no project with a significant impact on the environment will be implemented without further environment review.  Additionally, unlike in *Penfold*, the decision sought to be reviewed – adoption of the 2006 Forest Plan – substantially differs from the prior inadequately-supported decision – adoption of the 1992 Forest Plan – in that the alternatives considered, the alternative selected, and the supporting documents and analysis are different in form and in substance.  Thus, the square pegs in round holes problem.  Had the Forest Service revised its planning documents simply to supplement or replace the inadequate analysis in the 1992 FSEIS, the Court might have come to a different conclusion.  However, in light of the scope of the new analysis and its variance from the prior analysis, it is advisable to complete a new administrative appeal before comprehensive judicial review.

The Court is aware that, consistent with *Penfold*, it could decide whether the 2006 FEIS in its entirety is adequate without requiring an administrative appeal.  Instead, in the foregoing sections of this order the Court has undertaken the narrower inquiry of whether the 2006 Forest Plan had cured the specific errors noted in the Court's 1995 order.  Comprehensive review

33

should come only after exhaustion of administrative appeals.

Additionally, the Court believes the public interest is served by relieving the parties of the 1996 injunction.  While the plaintiffs are right that the public is entitled to informed decisionmaking after consideration of the environmental impacts of federal action, they may ensure that by appealing the 2006 Forest Plan through the administrative process.  However, the public also has an interest in the appropriate management of public forests based on decisions made by those with forest-planning expertise.  Until the 2006 Forest Plan is found to be lacking under the APA for some reason, it is a valid plan, and the public is entitled to the benefits it may bring to the Forest.

On a similar note, the Court found that the 1992 Forest Plan could not be implemented in full because it did not comply with laws related to forest planning.  The Forest is no longer being managed under the 1992 Forest Plan (Alternative 1 was not selected as the preferred alternative in the 2006 FEIS), which was superseded by the 2006 Forest Plan.  Thus, the violations of federal law identified by the Court in 1995 – inadequate analysis prior to implementation of the 1992 Forest Plan – are no longer ongoing and no longer need to be enjoined.  The goals of the 1996 injunction have been achieved – the inadequately supported parts of the 1992 Forest Plan are not being implemented.  Unless and until the NEPA process leading to the 2006 Forest Plan is determined to be inadequate and that plan is vacated in whole or in part, the Court will not enforce its 1996 injunction to prevent application of the new plan.

In sum, the Forest Service has carried its burden of demonstrating a significant change in factual circumstances warranting a change in the injunction.  Furthermore, the change it proposes – dissolving the injunction – is suitably tailored in light of the new forest plan, the new supporting documents, and the new opportunity to seek appropriate injunctive relief in a new

34

proceeding that can directly address the alleged shortcomings of the 2006 Forest Plan.

**VI.      Conclusion**

For the foregoing reasons, the Court finds that applying the permanent injunction issued

March 20, 1996 (Doc. 66) is no longer equitable and, pursuant to the last clause of Rule 60(b)(5),

exercises its discretion to **DISSOLVE** that injunction.

**IT IS SO ORDERED.**
**DATED:  March 5, 2013**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

## APPENDIX A
## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| ATV | All-Terrain Vehicle |
| BLM | Bureau of Land Management |
| EA | Environmental Assessment |
| FEIS | Final Environmental Impact Statement |
| FIMU | Forest Interior Management Unit |
| FSEIS | Final Supplemental Environmental Impact Statement |
| HC | Habitat Capability |
| HEP | Habitat Evaluation Program |
| HSI | Habitat Suitability Index |
| MBTA | Migratory Bird Treaty Act |
| MIS | Management Indicator Species |
| MUSYA | Multiple Use Sustained Yield Act |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| OHM | Off-Highway Motorcycle |
| RACE | Regional Association of Concerned Environmentalists |
| ROD | Record of Decision |